# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

CRAIG LEE MILLER,

     Plaintiff,

v.

                                   CASE NO.: 18-cv-1126-pp

CAROL STRAKS,

     Defendant.

## AMENDED COMPLAINT

For his Complaint, Plaintiff CRAIG LEE MILLER, hereby states and alleges as follows:

## INTRODUCTORY STATEMENT

This suit is filed by Plaintiff under 42 U.S.C. § 1983 for actions by the named defendants in failing to follow Federal, State laws and administrative rules concerning the protection of Plaintiff, a vulnerable person, who is an inmate in Kettle Moraine Correctional Institution (KMCI), a Wisconsin Department of Corrections (WDOC) facility. Plaintiff was sexually assaulted numerous times while seeking medical treatment in the Health Services Unit (HSU) of Oshkosh Correctional Institution ("OSCI"). Defendants failed to provide adequate supervision and training of staff specifically female nurses. WDOC failed to comply with Health Services

1

requirements and common standards within the medical profession such as: female providers not being alone with male patients/inmates, female civilian staff always being accompanied when supervising male inmates and providing adequate monitoring and supervision of inmates. WDOC further failed to adequately provide safeguards and protections for inmates from Defendant Carol Straks, an OSCI nurse, who, it is estimated sexually assaulted Plaintiff on a nearly daily basis between July 2011 and July 2012 while employed at OSCI. Defendants failed to recognize and respond to obvious signs Defendant Straks was grooming male prisoners, had a sexual predator pattern which was known to many staff members including other nurses in medical services, security staff and management at OSCI. Defendants failed to provide legally mandated counseling as required by the provisions of the Prison Rape Elimination Act (PREA) for the benefit and protection of the Plaintiff and subjected Plaintiff to recurring psychological damage by failing to treat his ongoing psychological injuries arising from the sexual abuse. Defendants failed to recognize and respond to obvious signs Defendant Straks was introducing narcotics and other contraband into the facility. Defendants failed to recognize and respond to obvious signs Defendant Straks was dispensing narcotics from HSU inventory to Plaintiff without a physician's prescription.

## JURISDICTION AND VENUE

1.     This is an action for money damages for injuries sustained by Plaintiff as a

2

result of acts, omissions, failure to act and/or deliberate indifference by Defendants against Plaintiff.

2. The Plaintiff asserts a claim for relief against the herein-named Defendants pursuant to 42 U.S.C. § 1983 and the Eighth Amendment of the United States Constitution. The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this matter.

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution and Laws of the United States, pursuant to 28 U.S.C. § 1343(a)(3) because this action seeks to redress the deprivation, under color of state law, of Plaintiff's civil rights.

4. This Court has supplemental jurisdiction over all state law claims which arise out of the same facts common to Plaintiff's federal claims pursuant to 28 U.S.C. § 1367.

5. The amount in controversy exceeds $75,000, excluding interests and costs.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this district and because part of the events and omissions giving rise to Plaintiff's claims occurred within this district.

7. Punitive damages are also properly awardable against Defendants and are

3

hereby claimed as a matter of federal common law, *Smith v. Wade*, 461 U.S. 30 (1983) and, as such, are not subject to the pleading requirements or the differing standard of proof set forth in Wis. Stat. §895.043.

8.    A jury trial is waived and Plaintiff requests Bench Trial.

## PARTIES TO THE ACTION

9.    Plaintiff was, at all times relevant and material herein, an adult citizen of the United States and a resident of the State of Wisconsin, and a prisoner in the State of Wisconsin. At all times material hereto, CRAIG LEE MILLER, was an inmate residing Oshkosh Correctional Institution at the time of the sexual assaults and at the time Plaintiff sought redress, treatment and services under PREA at Kettle Moraine Correctional Institution ("KMCI") of the Wisconsin Department of Corrections, and was entitled to all rights, privileges, and immunities accorded all residents of the State of Wisconsin, and citizens of the United States, pursuant to the Constitution of the United States.

10.    Defendant Gary Hamblin was at all relevant times Secretary of the WDOC and responsible for the enforcement and compliance with Federal law, including the United States Constitution and the mandates of the Prison Litigation Reform Act (PLRA), the Prison Rape Elimination Act of 2003 (PREA), and the laws of the State of Wisconsin. Defendant Hamblin approves and signs PREA audits for every WDOC institution in Wisconsin. He has implemented a zero-tolerance policy for

4

sexually assaulting inmates within WDOC by employees of WDOC. Defendant Hamblin has had Governor Scott Walker certify to the United States government that Wisconsin is in compliance in all regards and meeting all of the requirements of PREA for compliance in order to continue to secure federal funding to the State of Wisconsin.

11. Defendant John Doe #1 is the Deputy Director for WDOC and responsible for carrying out and implementing all policies of the Director and the Policy Group. He is responsible for the overall safe and secure operation of all WDOC correctional institutions.

12. Defendant John Doe #2 is the Assistant Director of Operations. He is the direct supervisor of every WDOC Superintendent within WDOC. Defendant Doe #2 has the authority to direct and implement changes within WDOC prisons. He oversees the budgeting for each institution and approves budget requests for security improvements within WDOC. Defendant Doe #2, as Assistant Director of Operations, is responsible for PREA compliance and the safe and secure operation of WDOC Institutions.

13. Defendant John Doe #3 was, at all relevant to the allegations set forth by the Plaintiff herein, the PREA Coordinator for the Department of Corrections. As the PREA Coordinator he would pass along PREA audit recommendations to

5

Defendants Hamblin, Doe #1, Doe #2 and the Wardens at OSCI and the KMCI and Directors of Security for OSCI and KMCI for implementation.

14. Defendant John Doe #4 was the WDOC Health Services Manager during all relevant times.

15. Defendant John Doe #5 was the Assistant Director of Correctional Services having direct oversight over WDOC Health Services and the Health Services Administrator during the relevant time period.

16. Defendant John Doe #6 was the Chief Clinical Officer for the WDOC during the relevant time period.

17. Defendant John Doe #7 was the Chief Medical Officer for WDOC at all time relevant to the allegations set forth herein by the Plaintiff.

18. Defendant John Doe #8 was the Behavioral Health Services Administrator for WDOC during the relevant time period.

19. Defendant Judy Smith was the Warden of OSCI at all time relevant to the allegations set forth herein by Plaintiff.

20. Defendant Robert Humphreys was the Warden of KMCI at all times relevant to the allegations set forth herein by Plaintiff.

21. Defendant John Doe #9 was the Director of Security at OSCI and was responsible along with the Warden for ensuring PREA compliance and that inmates were safe from sexual assault at OSCI.

6

22. Defendant Tom Pollard was the Director of Security at KMCI and was responsible along with the Warden for ensuring PREA compliance.

23. Defendant Carol Straks was a registered nurse working in the health services unit at OSCI.

24. Defendant Jane Doe #1 was the Nurse Manager for KMCI for the relevant time period.

## FACTUAL BACKGROUND
### (Oshkosh Correctional Institution)

25. Oshkosh Correctional Institution ("OCI") is a prison to house male prisoners in Wisconsin. It is located in Oshkosh, Wisconsin and contains a medium security facility. The facility has 2000 beds and was first opened in 1986.

26. Oshkosh Correctional Institution has cell and dormitory housing, work programs, skills training, treatment programs, health services, religious services, physical plant, a central records unit and administrative areas.

27. Since 1986, OCI has been the location of numerous sexual assaults, rapes and misconduct by staff against male inmates.

28. In June 2008, Becky Bathke, a former Oshkosh Correctional Institution employee, was sentenced to 18 months in prison for having sex with two male prisoners. Bathke worked in the prison's education department when she arranged sexual encounters with prisoners Ryan K. Rowe and Mark Prevatt.

29. In July 2018, Thirty-eight-year-old April Paulsen, a former OCI correctional officer, was charged with second-degree sexual assault by a correctional staff.

## FACTUAL BACKGROUND
### (Kettle Moraine Correctional Institution)

30. Kettle Moraine Correctional Institution ("KMCI") is a prison to house male prisoners in Wisconsin. It is located in Kettle Moraine, Wisconsin and contains a medium security facility. The facility has 1200 beds and was first opened in 1974.

31. Kettle Moraine Correctional Institution has cell and dormitory housing, work programs, skills training, treatment programs, health services, religious service, physical plant, a central records unit and administrative areas.

32. Since 1974, KMCI has been the location of numerous sexual assaults, rapes and misconduct by staff against male inmates.

33. In 2011, a special education teacher at Kettle Moraine Correctional Institution was charged with second-degree sexual assault for having sex with an inmate.

34. In April 2011, Laurie Blum, a nurse at Kettle Moraine Correctional Institution, was sentenced to three years' probation for having sex with an inmate. Blum was convicted of second-degree sexual assault after admitting having sex with an inmate in the prison's health services unit about six different times.

35. In 2018, Former Kettle Moraine Correctional Institution Officer Katy Moon was charged and ultimately pleaded guilty to misdemeanor charges after being accused of having a sexual relationship with an inmate.

8

36. Statistically Wisconsin Department of Corrections reported that in 2011 119 cases of sexual abuse were reported but only 10 of staff/inmate were founded. In 2012 there were 365 total reported with 34 of staff/inmate founded and in 2018, 465 instances of sexual abuse were reported and 70 were determined to be founded. These statistics are not accurate nor reflective of the events presently occurring in Wisconsin. Plaintiff and the other related cases herein report that staff will intimidate reporting inmates, put them in segregation, and subject them to other punishments in an effort to dissuade them from reporting. In some instances, staff make a concerted effort to intimidate all men at OSCI and KMCI from making any reports of sexual abuse.

37. Plaintiff has reason to believe based on reports and investigation that certain security staff have engaged in a policy and practice to intimidate and frighten men from coming forward as a prophylactic method to scare inmates.

38. Following the investigations noted in paragraphs 27 and 32 above, several of the victims were placed in segregated housing, lost their jobs, lost their programs and were subject to intimidation and threats by security staff. None of the inmates mentioned above nor the Plaintiff in this case have received any mental health counseling or access to the PREA victim's advocate since their respective incidents. The victims of sexual abuse have a history of mistreatment by WDOC such that they believe they will lose housing, go to the 'hole', lose their jobs, lose visits with family

9

and children, have no access to mental health counseling and will be subject to numerous daily indignities by security staff who attempt to coerce inmates into silence.

## WISCONSIN STATUTES

39. Wisconsin Statutes mandate the Wisconsin Department of Corrections to provide adequate food, clothing, health and medical care, sanitation and security for persons confined.

40. Wisconsin Statutes mandate the Secretary of the Wisconsin Department of Corrections shall provide for the safety of all prisoners in the custody of the department.

41. On January 2, 2008, the Department of Justice issued the final rule adopting national standards to prevent, detect, and respond to prison rape, as required by the Prison Rape Elimination Act of 2003 (PREA).

42. The Wisconsin Department of Corrections has a zero-tolerance policy for sexual abuse. The Prison Rape Elimination Act of 2003 is a federal law that seeks to eliminate sexual assaults and sexual misconduct. This law applies to all federal and state prisons, jails, police lock-ups, private facilities, juvenile facilities, and community correctional settings. The Bureau of Justice Statistics carries out, annually, a comprehensive statistical review and analysis of the incidence and effects of prison rape. The major provisions of the standards are: General prevention

10

planning, supervision and monitoring, cross gender searches and viewing, training and education, screening, reporting, responsiveness planning, investigations, discipline, medical and mental health, grievances, and audits. DOC continues its efforts to maintain safety for all inmates and others inside the facilities keeping PREA as a top priority. WDOC in inmate publications, handbooks, posters, fliers, and other types of communications with inmates has created an expectation that WDOC will do everything within its powers to protect inmates from staff assault and that WDOC expects inmates to be respected by staff at all times.

### (Medical Care at OSCI)

43. The Health Services Director is responsible for directing inmate health care services including developing standards for the organization, coordination and delivery of healthcare, ensuring the operation of inmate healthcare comply with appropriate professional standards, statutory requirements and administrative rules and policies.

44. The Health Services clinical medical director is responsible for professional oversight of clinical healthcare providers. The Health Services clinical director shall appoint a chief medical officer to provide oversight for professional clinical services to inmates at each facility.

45. The administrator for Clinical Operations is responsible for overall organization and delivery of institutional clinical care.

11

46.     Health Services administration appoints a Health Services manager to organize and coordinate delivery of healthcare services to inmates for each Department of Corrections facility.

47.     WDOC Health Services is responsible for providing medical care to over 23,000 inmates in the Wisconsin Department of Corrections State Prison system. The State has a moral and legal obligation to provide health care for those people whom it incarcerates. The Federal Courts have mandated that inmates, though incarcerated, remain entitled to basic medical care. These inmates enter the system with a lower than average educational level, lower than average income, and a higher than average rate of illness and chronic disease.

48.     Defendant Straks was employed at OSCI as a registered nurse. Plaintiff does not have information as to how long she was employed for the State of Wisconsin but information indicates she had been a nurse at OSCI since at least 2011.

49.     Defendant Straks systematically sexually harassed, assaulted and pursued Plaintiff throughout her employment at OSCI. Defendant Straks would test the boundaries of security and her victim to see if anything would happen. Plaintiff has no information of any staff member who took steps to protect any inmate from Straks's predatory behavior. Plaintiff knows of at least two other inmates sexually assaulted by Defendant Straks.

12

50. Defendant Straks was responsible for administering analgesic ointment rubs to patients for pain treatment. Defendant Straks also worked in medical services treating patients who were being seen. Defendant Straks also had both authorized and unauthorized access to the health services unit's dispensary for pharmaceutical narcotics.

51. Defendant Straks was allowed access to male inmates without any chaperone or supervision. She was permitted to be alone in exam rooms in the Health Services Unit with Plaintiff. Defendant Straks kissed, cuddled, fondled and engaged in various levels of sexual activities, including sexual intercourse and oral sex, in these private areas. Plaintiff was too afraid to come forward based on the manner in which inmates were treated in the previous investigations.

52. Defendant Straks volunteered to work during the weekend in order to extend the amount of time she could spend with Plaintiff.

53. Defendant Straks identified Plaintiff as particularly vulnerable because of his significant historical drug dependency issues. Defendant Straks provided drugs to Plaintiff both from contraband which she smuggled into OSCI or from the health services unit dispensary. Plaintiff's drug use histories were easily accessed by Straks on the WDOC central medical record keeping database and Plaintiff's individual file.

54. Defendant Straks would provide Plaintiff with 8-10 pills at least twice a month consisting of either Vicodin or Oxycotin to encourage his drug use and substance abuse issues.

55. During medical appointments Defendant Straks met with Plaintiff alone and engaged in sexual activity which included fondling, cuddling, kissing, oral sex and/or sexual intercourse. Plaintiff believes that he may not have been the only inmate abused in this fashion given the fact no one was paying any attention to Straks and it is unknown whether WDOC engaged in any real investigation.

56. Defendant Straks began her pursuit of Plaintiff with grooming behavior designed to elicit trust including complimenting Plaintiff, flirting with Plaintiff, engaging in personal conversations, providing special benefits to him. As the months progressed Straks no longer worried about hiding her behavior and often would take notice of Plaintiff in his cell unit area by waiving or winking at him in the presence of other inmates and security staff.

57. Defendant Straks' was charged with applying an analgesic ointment which was a controlled substance upon the back of Plaintiff for treatment of pain from prior laminectomies to his spine. During these treatments, Defendant Straks would converse with Plaintiff an feign empathy with his historical "demons" such as alcohol abuse starting at age 10, his parents raising him in a bar they operated and his escalation to illicit drugs at the age of 12.

14

58. Defendant Straks would describe her homelife as miserable, talk about her divorce, issues she had with her former husband, her use of pain medication both prescribed and illicit. Plaintiff felt trapped and as if he had to "keep her happy" to keep her from cutting off his access to the pain pills to feed his now-revived addiction.

59. Defendant Straks on occasion intimated that she had been "called-in" by supervisors to investigate suspicious activity between her and Plaintiff and other inmates. Defendant Straks informed Plaintiff that if he tried to "cut things off" she would say he assaulted her, and no one would believe him, and he would be in enough trouble to be incarcerated for the rest of his life. Plaintiff was 56 and 57 years of age at time.

60. Defendant Straks was aware of Plaintiff's mental and emotional issues related to his being molested as a child by a family member and his life-long struggles with depression.

## PREA

61. The Prison Rape Elimination Act (PREA) became federal law in 2003. The Wisconsin Department of Corrections adopted the mandates of PREA in Directive #72 of January 2008. The rule was modified in 2016 and the version applicable to the events alleged herein was formally adopted.

15

62. The purpose of PREA is to provide for the analysis of the incidence and effects of prison rape in federal, state and local institutions and to provide information, resources, recommendations and funding to protect individuals from prison rape. PREA seeks to establish a zero-tolerance policy regarding rape and sexual abuse inside correctional facilities. PREA also mandated the publication of standards to ensure compliance and to improve prevention, detection and response strategies in addressing sexual abuse and assault.

63. The requirements of DOC Policy and PREA include prevention, planning, investigation, prosecution, and provide counseling and treatment to victims. Wisconsin identifies itself as being committed to a zero-tolerance standard for sex abuse and sex harassment. Policy.

64. The Agency PREA Coordinator is responsible for the development, implementation and oversight of the department's compliance with the PREA standards in all department facilities. In order for this coordination to occur the Operations Division, which Defendant John Doe #3 is in charge of, has to authorize the recommended implementation recommendations. Without the adoption, cooperation on approval of the Operations Division, the Agency PREA Coordinator lacks authority to enact change.

65. The PREA compliance manager is a management staff person designated by the institution functional unit manager, with sufficient time and authority to

16

coordinate the facilities' efforts to comply with the federal PREA standards. However, absent the approval and direction of the Superintendent and Assistant Superintendent of Security, the PREA Compliance Manager lacks operational authority to make any changes or order anything to occur differently at an institution.

66. Sexual abuse of an inmate by a staff member, contractor or volunteer includes any of the following acts, with or without consent of the inmate, detainee or resident:

    a.    contact between the penis and vulva or the penis and anus including any degree of penetration,

    b.    contact between the mouth, the penis, vulva or anus,

    c.    contact between the mouth and any body part where the staff member, contractor, or volunteer has the intent to abuse, arouse or gratify sexual desire,

    d.    penetration of the anal or genital opening by hand, finger, object or other instrument, that is unrelated to official duties or where the staff member contractor, or volunteer has the intent to abuse, arouse or gratify sexual desire,

    e.    any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh or the buttocks that is unrelated to the official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse or gratify sexual desire,

    f.    any attempt, threat, or request by a staff member, contractor of volunteer to engage in the activities described in this section,

17

g.  any display by a staff member, contractor or volunteer of his or her uncovered genitalia, buttocks or breast in the presence of an inmate, detainee or resident, and

h.  voyeurism by a staff member, contractor or volunteer.

67.  The Sexual Abuse liaison is a management staff person designated by the institution functional unit manager to coordinate response, reporting and monitoring of inmate abuse with the institution. The sexual abuse liaison shall be assigned as the Sexual Abuse Response Team (SART) leader.

68.  The SART is a team of institution staff consisting of a Behavioral Health Services (BHS) staff member, a Medical Services staff member and the sexual abuse liaison who are designated by the functional unit manager to respond to all allegations of inmate sexual abuse or sexual coercion.

69.  All staff are covered by the mandates of PREA and Policy including all WDOC employees, contract service providers and volunteers.

70.  Policy mandates that all WDOC staff "must be able to recognize the signs of sexual abuse and sexual harassment and understand their responsibility in the detection, prevention, response and reporting of an alleged sexual abuse or sexual harassment".

18

71. Each facility is required to conduct and document unannounced rounds on all shifts to deter staff sexual abuse and sexual harassment. Staff is prohibited from alerting other staff members that the supervisory rounds are occurring.

72. The department shall ensure that each facility it operates develops and documents a staffing plan that provides for adequate levels of staffing to protect inmates against sexual abuse.

73. Policy requires regular training for staff on detecting sexual abuse, supervision of inmates, new employee orientation and orientation to all staff on sexual abuse and the zero-tolerance policy shall be given, inmates are to be educated on "avoiding" risk situations, safely reporting sexual abuse, obtaining mental health services if victimized, the inmate's right to be free from sexual abuse and the inmate's right to be free from retaliation.

74. Policy mandates access to services for inmate of all sexual abuse or sexual harassment including reporting. Inmates who are found to have made "bad faith" allegations of sexual abuse will be held accountable through all means available to the DOC including discipline. It is not known to Plaintiff which WDOC staff members are properly trained in sexual abuse and misconduct investigations.

75. Policy mandates all staff to report "immediately any knowledge, suspicion or information regarding sexual abuse, sexual harassment, retaliation by inmate or staff

Case 2:18-cv-01126-PP   Filed 03/26/21   Page 19 of 42   Document 40

for reporting or staff neglect or violation of responsibility that may have contributed to such incidents.

76. Policy sets forth the procedures to be followed when a complaint of sexual abuse or harassment is received. The PREA Compliance Manager shall be responsible for monitoring all inmates and staff to protect from retaliation or harassment by other staff or inmates.

77. The Wisconsin Department of Corrections states there is to be no long-term forfeiture of services and programs for victims of sexual abuse and that the safety of the victim is paramount.

78. Inmates will be housed in the least restrictive housing, will have timely unimpeded access to emergency medical treatment, necessary post event treatment including coordination with community hospitals, testing for sexually transmitted diseases, comprehensive information and timely access to all lawful pregnancy-related medical services, referral to Behavior Health Services and communication with a designated sexual abuse liaison regarding further information required.

79. Mental health services are required to be provided for victims of sexual abuse including timely, unimpeded access to appropriate mental health evaluation services without financial cost, comprehensive information on the limits of confidentiality and duty to report, completion of a mental health evaluation to include suicide risk

20

screening, notification of the Officer in Charge and Medical Services regarding recommended actions, follow up mental health services.

## RESPONSE TO PRIOR PREA INVESTIGATIONS

80. In a community relations board meeting with KMCI staff dated November 29, 2017, Defendant Tom Pollard, Security Director and facility PREA Coordinator stated "We had audit in 2015 and are required to go through one every two years. We did very well again this year. In the last audit we were missing a memo of understanding with the Sexual Assault Response Team. This was solidified this time around. Standards keep changing and we had two deficiencies that were department wide that have since been corrected. We repurposed some old cameras and the school is receiving those cameras in the classroom. KMCI has a very good camera system throughout the institution.

81. In June 2018, 24-year-old Kettle Moraine Correctional Institute employee was charged with felony second-degree sexual assault by correctional staff after an inmate at the Sheboygan County facility told officials the pair had sexual contact. An inmate approached correctional staff about the sexual contact with correctional officer, Thomas Herbert Wiesner and, among other things, recounted a sexual encounter inside a closet or storage area that was outside the view of cameras.

**Craig Lee Miller**

21

82. Plaintiff grew up in a home where all the adults used alcohol on a daily basis. Plaintiff was left alone with babysitters or other family members. He was molested by a family member between the ages of 10-13, and, eventually, became addicted to alcohol and illicit drugs.

83. Plaintiff had daily contact with Defendant Straks. The sexual contact between Plaintiff and Straks occurred from July 2011 until approximately July 2012. Plaintiff was unable to file formal complaints for fear of retaliation and possibly being wrongfully convicted and sentenced to additional years of incarceration.

84. Defendant Straks would frequently brush up against Plaintiff, flirting with him, making inappropriate comments, asking personal questions and sharing significant information about her own private matters. Straks made frequent inappropriate comments about Plaintiff's body her behaviors escalated over time. Straks was able to conduct himself so openly she believed she was untouchable and obviously it is clear to Plaintiff that no one at WDOC cares about the well-being or safety of inmates in OSCI.

85. During the same time period Straks, knowing of Plaintiff's prior substance abuse issues and drug dependency, would feed Plaintiff (pills) (amounts) (frequency) from her "stash" which she smuggled into the facility as contraband.

22

86. During the same time period Straks, when her personal "stash" was low or empty, would feed Plaintiff Vicodin and/or Oxycotin which she had pilfered from the HSU dispensary or pills that were supposed to be given to other inmates.

87. Plaintiff filed grievances for the sexual assaults, sexual misconduct, and the failure of WDOC to provide counseling to him. These grievances were all denied. Plaintiff requested counseling from Health Services for the sexual mistreatment by Straks but was sent a written response stating the allegations were unfounded.

88. Plaintiff was interviewed by the Winnebago Sheriff's Department during a criminal investigation of Straks's conduct.

89. Defendants Hamblin, John Doe #1, 2, 3, 4, 5, 6, 7, 8, 9, Pollard, Smith and Humphreys have known for years of various different technology security solutions that would aid in the prevention and deterrence of sexual assault in prisons. For example, within the corrections industry prisons have used radio frequency identification (RFID) tags for tracking individual inmate and staff movement in real time within the walls and fences of prisons. The RFID is worn in a wrist band or ankle band. The technology allows the prison to tracking inmate and staff movement around the clock. The system would alert the institution if a staff member were alone with an inmate within a particular area and send a security alert. Because both inmate and staff are monitored there is a significant deterrence to staff isolating an inmate for assault and there is a digital record or footprint of their movements within the

23

system can also be used to monitor prison gang activity and send alerts when known gang members are congregating together or are in close proximity to vulnerable inmates. This system would have easily monitored defendant Straks's movements within OSCI.

90.     Inmates are subject to significant degrading and dehumanizing treatment simply because they are incarcerated. They are captive in prison and must take all actions asked of them by prison staff or they can lose jobs, housing, and visits with their children, which are the total sum of what they are entitled to in prison. And as previously alleged herein, certain security staff make it their business to demean these inmates even more by threatening and bullying them. This is in contrast to the public face that WDOC displays with its outward appearance of support of PREA and its zero tolerance policies against the sexual assault of inmates. WDOC has created an expectation that certain standards will be met, laws will be followed, rights will be protected and that inmates will be safe. Yet year after year inmates at OSCI, KMCI and other correctional facilities throughout WDOC are victimized by staff.

91.     As a result of the sexual abuse by Defendant Straks and the failure by other staff and management staff to supervise Straks, Plaintiff suffered extreme anxiety, was prevented from accessing medical care, had exacerbation of his underlying PTSD and anxiety disorder, felt extremely unsafe and vulnerable in his incarceration

Case 2:18-cv-01126-PP     Filed 03/26/21     Page 24 of 42     Document 40

and felt no one would protect him even if worse things occurred such as being accused of being the sexual aggressor or assaulter. He was also denied access to his PREA advocate and counseling to address his ongoing emotional damages.

92. As a result of the numerous failures by staff, management and policy to protect him, Plaintiff suffered economic and non-economic losses of no less than $1,000,000. He remains emotionally traumatized and is seeking mental health counseling and is experiencing additional losses to his sense of safety and well-being.

**FIRST CLAIM FOR RELIEF: 42 U.S.C. §1983**
**Violations of 8th/14th Amendment: Sexual Battery**
**Defendant Straks**

93. Plaintiff realleges all previous paragraphs as if more fully set forth herein.

94. Plaintiff is entitled to be held in safe and humane conditions of confinement throughout his incarceration. He is entitled to be free of unwanted and unwarranted sexual touching and abuse. He is entitled to his own personal bodily integrity whether in custody or not pursuant to the parameters of the 8th and 14th Amendments to the United States Constitution. Plaintiff is also entitled to be safe and secure from undue and excessive force while in custody.

95. The acts and omissions of Defendant Straks violated Plaintiff's protected rights and were an excessive intrusion onto his person without just cause and amounted to deliberate indifference to Plaintiff's protected rights and his own

25

personal safety. Defendants violated the requirements of the 8 and 14th Amendment rights held by Plaintiff through the use of excessive force, intentional and abusive sexual assault, kidnapping, illicit drug use and subjecting him to unsafe and inhumane conditions of confinement.

96.     The specific acts of Defendants individually and alleged to be deliberately indifferent are more particularly set forth below.

1.     Defendant Straks sexually touched or caused serious bodily harm and significant mental distress to Plaintiff. The actions of Defendant Straks against Plaintiff occurred for months on end from July 2011 through July 2012.

2.     Defendant Straks acted in violation of existing medical protocols, standards of care, the United States Constitution, state and federal laws as well as rules.

97.     As a result of the violations of the Constitutional standards set forth herein, Plaintiff suffered forcible, non-consensual and physical assaults to his person, severe emotional trauma from the ongoing assaults and threats, illicit drug use and a significant deterioration in his mental state causing him to become severely depressed. Plaintiff suffered extreme fear while the assaults were occurring which was made worse because he knew or believed that no one would stop Defendant Straks and would likely blame him. He was isolated, helpless and disregarded. As a result of the violations of the Constitutional standards set forth herein, Plaintiff has

26

suffered from forms of stress, depression, anxiety and an exacerbation of his underlying problems from early substance abuse.

98. As a result of the violations of the Constitutional standards set forth herein, Plaintiff continues to suffer from post-traumatic anxiety, stress, anger and depression and ongoing battles with stress.

99. As a result of the violations of the Constitution Plaintiff seeks economic and noneconomic damages in a sum to be more fully determined at trial but no less than $1,000,000. Plaintiff seeks punitive damages against Defendants.

100. All Defendants' conduct was well defined by law and each defendant knew or reasonably should have known that their conduct was not only well below the standard prescribed by law herein but was illegal per se.

### SECOND CLAIM FOR RELIEF: 8TH Amendment violation
### Failure to Protect: All Defendants

101. Plaintiff realleges all previous paragraphs as if more fully set forth herein.

102. Plaintiff, as a prisoner confined to a correctional facility, is entitled to be provided the essential aspects of a safe, sanitary and humane confinement including protection from harms and threats to his safety and security under the laws of the State of Orgon and the 8th Amendment to the United States Constitution.

103. Plaintiff is entitled to the full protection of the laws including the Prison Litigation Reform Act and the Prison Rape Elimination Act which requires WDOC

27

and defendants to comply with the laws in providing protection from assault including rape, providing protection to vulnerable inmates and to comply with all aspects of intervening and providing a safe environment to Plaintiff.

104. Defendants violated the Constitutional and statutory rights held by Plaintiff in the following ways:

1. Failed to provide adequate monitoring of Defendant Straks while she treated male patients;

2. Failed to object, stop or discipline Straks for her obvious, continual and open grooming behaviors, repeated inappropriate touching, repeated inappropriate comments, flirtatious conduct and obvious sexual contact with Plaintiff on a near daily basis;

3. Failed to enforce existing safeguards designed to protect inmate patients including the use of chaperones;

4. Willfully ignoring clear violations of restrictions on contact and behavior permitted between staff and inmate;

5. Willfully ignoring clear signs of "grooming" and sexualized behavior by staff toward inmates;

6. Provided an openly hostile, abusive, demeaning and threatening environment for all prisoners including threatening them proactively with punishment if they complained, automatically dismissing complaints of

28

sexual conduct by staff, removing privileges and benefits of the inmates if they made complaints of sexual misconduct, actual enforcement of disciplinary measures on inmates to dissuade them from making complaints, failing to provide anonymity for inmates to make complaints or participate in investigations, advising inmates they would be punished for making complaints and a long history of accusing prisoners of lying about sexual experiences;

7.     Failing to provide adequate post-abuse therapeutic counseling despite repeated requests by the victims; and

8.     Engaging in inappropriate searches, confiscating legal mail, and reading and seizing therapeutic journals kept by the inmates.

105.   As a result of the behaviors of the defendants herein Plaintiff suffered repeated sexual assault, was placed in constant fear for his safety, felt fear to meet with advocates, was denied abuse counseling, could not safely access medical care and his underlying anxiety and PTSD were severely exacerbated.

**THIRD CLAIM FOR RELIEF: 8TH Amendment Violations**
**Delay and Denial of Essential Psychological and Medical Care**
**All Defendants**

106.   Plaintiff realleges all previous paragraphs as if more fully set forth herein.

107.   Plaintiff is entitled to timely and adequate medical/psychological care as part of his Constitutionally guaranteed conditions of confinement pursuant to the 8th

29

Amendment to the United States Constitution. Failure to provide timely and adequate medical care is a violation of the 8th Amendment prohibitions against cruel and unusual punishment. Furthermore, the PREA defines additional mandates for treatment after a sexual assault which is guaranteed to each prisoner.

108. Plaintiff was denied any psychological treatment, counseling or mental health care as required by state and federal law and in fact was told no such treatment would be provided because of orders from the highest levels of WDOC management.

109. Plaintiff is entitled to timely unimpeded access to appropriate mental health evaluation, mental health evaluation including suicide risks, mental health services follow up as needed pursuant to federal and state law and the 8th Amendment to the United States Constitution.

110. Defendants denied Plaintiff mental health evaluations, mental health treatment and any and all follow up to address her depressive issues arising from the assaults and his psychological trauma resulting from the assaults as required by law.

111. As a result of the failures by defendants herein Plaintiff suffered ongoing psychological trauma as he was denied treatment and further traumatized by the indifferent and demeaning treatment by Defendants. His psychological condition has deteriorated and been exacerbated by the numerous failures of defendants here all to Plaintiff's economic and non-economic damage of $1,000,000.

**FOURTH CLAIM FOR RELIEF**
**8th/14th Amendment Violations-42 U.S.C. §1983**

30

## Failure to Supervise: Defendants Hamblin, John Does #1-9 and Smith

112. Plaintiff realleges all previous paragraphs as if more fully set forth herein.

113. The constitutional deprivations suffered by Plaintiff are the proximate and direct cause of a non-interested, indifferent and willfully ignorant supervisory practice by the named defendants. The supervisors have a constitutional duty to protect prisoners and to provide them with a safe and humane condition of confinement including the right to be free from sexual abuse and assault by staff. This duty imposed on supervisory staff includes the obligation under law to fully investigate claims of sexual misconduct by staff against prisoners, the mandatory duty to report and address claims of sexual assault on prisoners, the duty to maintain a good and constant supervision of female staff supervising male prisoners.

114. The constitutional deprivations committed by the supervisory staff were long-standing and in the face of several years of obvious and notable signs about the predatory habits of Straks, such as her ability to set her own schedule, roam the facility at will, pull inmates from their housing units during off hours, have unchaperoned access to inmates, her failure to follow recommended guidelines for interactions with patients and prisoners, her lack of accountability, numerous rumors and innuendo, and a complete lack of investigation and follow up.

115. The supervisory staff failed in the following particulars:

31

1.    Failed to implement adequate inmate monitoring and managing process after the repeated sexual violations at OSCI noted above;

2.    Failed to provide adequate safeguards to keep inmates from meeting alone with staff;

3.    Failed to ensure that female medical providers were chaperoned in physical exams with men;

4.    Failed to do regular audits and evaluation of inmate movement to medical including keeping records of the reason for the visits, the timing and the nature of the visit;

5.    Failed to note and respond to evidence of abuse, and the obvious and clear record of a predatory sex offender in their midst;

6.    The supervisors refused to take action because they purposefully disregarded the complaints of prisoners, did not believe anyone would care about the wellbeing of the prisoners, did not believe anyone would believe prisoners and generally allowed Straks to thrive in plain sight;

7.    Supervisory staff treated the prisoners as if they deserved the abuse they received. If any one of the supervisory staff had followed through on the complaints and obvious signs of abuse the plaintiff in this action would not have been sexually assaulted or abused;

8. Supervisors tolerated if not encouraged an atmosphere of bullying, threatening and retaliating against inmates who came forward with concerns about the sexual behavior of staff;

9. Supervisors tolerated and encouraged staff to take proactive measures discouraging complaints about sexual behaviors;

10. Supervisors refused to allow victims to access legal mail, legal counselors, searched legal mail, instructed grievances to be denied and delayed for arbitrary reasons meeting with PREA advocates and lawyers;

11. Supervisors have taken an informal policy approach that the staff members are more important than prisoners and must be protected from any and all complaints by prisoners; and

12. Supervisors issued orders that the Plaintiff would not receive the guarantees of federal and state law including mental health counseling and access to his chosen PREA advocate.

116. Furthermore the supervisory staff failed the Plaintiff by failing to institute national standards for prison security by failing to inspect staff members coming and going from prison, failing to stop the introduction of contraband into the prison by staff, failing to follow up on location and work production by subordinate staff, failing to demand accountability by subordinate staff, and failing to have safe and adequate investigative procedures for complaints made by prisoners toward staff.

33

117. As a result of the unconstitutional practice by supervisors which was promoted, allowed or facilitated within KMCI, informants, witnesses or victims of sexual abuse were ignored or retaliated against for filing complaints of sexual abuse.

**FIFTH CLAIM FOR RELIEF**
**Injunctive Relief**
**State of Wisconsin**

118. Plaintiff realleges all previous paragraphs as if more fully set forth herein.

119. Plaintiff is entitled to seek injunctive, declaratory and protective relief in cases brought pursuant to 42 U.S.C.1983. Plaintiff may bring such claims against the state without raising concerns of sovereign immunity.

120. Defendant State of Wisconsin, by and through the Wisconsin Department of Corrections is obligated by federal law and the United States Constitution to protect inmates from sexual abuse and assault. The passage of the Prison Rape Elimination Act in 2003 and the subsequent formalizing of the requirements into state mandate by Directive #72 imposed statutory and federalized duties on the State of Wisconsin to insure they adhered to the national standards in training of staff in detection of sexual misconduct, investigation of sexual misconduct based claims, prohibitions against retaliation against victims who raised claims, post investigative procedures, protection of victims and the provision of medical and psychological care to those victimized by sexual abuse inside prisons.

34

121.    The Department of Corrections, the immediate past Director of WDOC, and the present Director of WDOC publicly note their strong adherence to a zero-tolerance policy for sexual misconduct inside the prisons. This is evidenced by numerous public statements, press releases and travel broadly in the United States giving public speeches, engaged in education and training touting their strong adherence to such a zero-tolerance policy.

122.    The State of Wisconsin is obligated under the terms and conditions of federal mandate to provide regular audits and updates on incidence of sexual misconduct and investigations. The numbers reported by WDOC indicate that a very, very few number of complaints result in actual findings of fault. Plaintiff alleges these audits and findings are not accurate and have been influenced by WDOC's political agenda and fiscal obligations. The Wisconsin Department of Corrections made assurances and promises to the state legislature on PREA compliance to obtain funding and to represent it is in compliance with all levels and aspects of PREA requirements. Plaintiff alleges these statements by WDOC are likely inherently flawed, falsified or manipulated and do not reflect accurately the state of matters inside OSCI and KMCI at least.

123.    Plaintiff alleges since the opening of OSCI and KMCI there have been sex abuse "scandals" involving inmates and conduct traversing several months, years and more than a decade. Each of these major events occurred in each year OSCI and

35

KMCI have been open. In many of those previous "scandals" Plaintiff alleges several inmates were dismissed as lacking credibility by WDOC and generally it was not until those inmates filed suit did WDOC take any action. Additionally, many of those cases involved allegations against supervisors and managers who failed to stop abuse, failed to investigate, failed to supervise and generally turned a blind eye to behavior that violated existing protocols, rules and policies.

124. The allegations in the 2011 claims against nurse Laurie Blum involved very similar claims as are raised in this litigation including the failure of female medical providers to have chaperones, female providers having unlimited and easy access to inmates often without medical reason, failure to conduct any audits, chart reviews or any type of process evaluation to ensure the protection of male patients.

125. Plaintiff is aware of other allegations against other female staff members of sexual misconduct which were never investigated due to severe punitive measures taken against the inmates, retaliation against those inmates, removal of privileges including access to personal and phone contact with family, loss of job, loss of access to areas of the prison, removal of all personal possession, searches only involving the complaining inmates, inappropriate verbal threats and isolating inmates for additional punitive measures.

126. Staff are poorly trained in investigation of sexual abuse, poorly trained to detect predatory or grooming conduct, are encouraged by other staff to denigrate and

mistrust the prisoners' claims of sexual abuse, evidence is rarely collected, inmates are threatened routinely as part of investigations and there is a pervasive culture which provides ongoing intimidation against inmates to raise any complaint about any staff member over misconduct especially sexual misconduct.

127. Each new investigation brings much publicity, some investigations and sometimes prosecution. Each new investigation brings public promises and assurances by WDOC that the problems are only isolated to single bad actors and that the prison system cannot control or manage this situation adequately. WDOC fails to follow suggestions made in past audits concerning staffing, surveillance, electronic monitoring of inmates, severe discipline of perpetrators, adequate training and adequate internal audits of staff movements, activities and compliance with PREA and law. Usually, WDOC just terminates the employment of offending employees, as in the instant case, and takes no additional action.

128. Plaintiff alleges that without aggressive federal court intervention and management, the situations at OSCI and KMCI will continue to worsen, no significant change will occur, and no prisoner will be safe. Plaintiff alleges the systemic and system-wide level of management indifference to the mandates of PREA and the safety of inmates is so significant as to amount to no protection at all. Plaintiff alleges that inmates are sexually harassed, abused, threatened and

mistreated daily at OSCI and KMCI but the pervasive culture has been successful at deflecting any criticism and avoiding any real and significant change.

129.   Plaintiff seeks the appointment of a court-appointed Special Master to audit, review, interview and investigate the widespread issues alleged in this complaint, to use outside auditors, review their recommendations and make changes to rules, management practice, training and the adherence to PREA as follows:

1.     Select outside auditors to include those who represent the interests of prisoners to review allegations against all staff concerning sexual abuse, harassment, retaliation;

2.     To review all recommendations made by the auditors and to impose those policies, practices and procedures to best protect inmates in all areas of the prison, and including medical;

3.     To review and implement new policies, if called for, to the movement of inmates around the prison so that they are carefully monitored and assessed for their location, reason for movement and the legitimacy of the movement;

4.     To review and implement new policies, if recommended, to utilize new technologies including electronic key access to prison locations, to track movement of all persons inside the prison and yard areas and to monitor movement inside the prison;

38

5. To review and implement new policies restricting female staff personnel assignment to those positions with limited physical access to male prisoners. These policies would examine the assignment of male only staff to housing areas, medical areas, private areas of the prison and would guarantee that female staff are never alone with a male prisoner at any time;

6. To order all changes necessary to protect inmates from unwanted sexual contact in private secret areas of the prison;

7. To provide training recommendation to prison staff on the standard of care method to assess predatory and grooming sexual behavior and to provide training to managers in detecting and stopping inappropriate sexual behavior;

8. To provide a proper and safe investigative process that shields the victims and witnesses from repercussions from staff and other inmates; and

9. To provide access to immediate and ongoing medical and psychological care removed from the fears and orders of interfering management.

## SIXTH CLAIM FOR RELIEF: Sexual Assault and Battery
### State of Wisconsin/Defendant Straks

130. Plaintiff realleges all matters previously alleged herein as if more fully set forth.

131. Plaintiff is entitled to be held in safe and humane conditions of confinement throughout her incarceration. He is entitled to be free of unwanted and unwarranted sexual touching and abuse. He is entitled to his own personal bodily integrity

39

whether in custody or not pursuant to the parameters of the 8th and 14th Amendments to the United States Constitution. Plaintiff is also entitled to be safe and secure from undue and excessive force while in custody.

132. The acts and omissions of Defendant Straks violated Plaintiff's protected rights and were an excessive intrusion onto his person without just cause and amounted to intentional violent physical touching. Defendants violated Plaintiff's bodily integrity through the use of excessive force, intentional and abusive sexual assault, and subjecting him to unsafe and inhumane conditions of confinement.

133. The specific acts of Defendants individually and alleged to be intentional are more particularly set forth below.

1. Defendant Straks sexually touched or caused serious bodily harm and significant mental distress to Plaintiff. The actions of Defendant Straks against Plaintiff occurred in 2011 through June 2012;

2. Defendant Straks acted in violation of existing medical protocols, standards of care, the United States Constitution, state and federal laws as well as rules.

134. As a result of the violations set forth herein, Plaintiff suffered forcible, non-consensual and physical assaults to his person, severe emotional trauma from the ongoing assaults and threats, and a significant deterioration in his mental state causing him to become severely depressed. Plaintiff suffered extreme fear while the

40

assaults were occurring which was made worse because he knew or believed that no one would stop Straks and would likely blame him. He was isolated, helpless and disregarded. As a result of the violations set forth herein, Plaintiff has suffered from forms of stress, depression, anxiety and an exacerbation of her underlying problems from early substance abuse.

135. As a result of the violations set forth herein, Plaintiff continues to suffer from post-traumatic anxiety, stress, anger and depression and ongoing battles with stress.

136. As a result of these violations, Plaintiff seeks economic and noneconomic damages in a sum to be more fully determined at trial but no less than $1,000,000.

137. All Defendants' conduct was well defined by law and each defendant knew or reasonably should have known that their conduct was not only well below the standard prescribed by law herein but was illegal per se.

**WHEREFORE** Plaintiff prays for relief:

1. Findings that any or all defendants violated his protected Constitutional rights;

2. Findings that as a result of the Constitutional violations alleged herein Plaintiff has sustained harm and damages in an amount no less than $1,000,000;

3. Findings that the cause of the constitutional violations is intentional or so grossly and deliberately indifferent to justify the award of punitive damages against each named defendant in a sum no less than $100,000 each;

41

4.     Findings that there exists an ongoing harm to all inmates still in custody and that without preliminary orders and the appointment of a Special Master, no changes will be made and inmates will continue to be sexually abused, raped and harmed;

5.     Findings that Plaintiff was subject to sexual battery and assault as a result of the actions of individuals in the employment of the State of Wisconsin; and

6.     Findings that plaintiff is entitled to his attorney fees and costs.

## JURY DEMAND

Plaintiff, CRAIG LEE MILLER, hereby waives a trial by jury pursuant to Federal Rules of Civil Procedure 38(b) and request Bench Trial.

Dated: March 26, 2021.

RESPECTFULLY SUBMITTED,

Lonnie D. Story, Esquire
Attorney for Plaintiff
STORY LAW FIRM, LLC
Wis. Bar #1121459
732 N. Halifax Avenue, #301
Daytona Beach, Florida 32118
(386) 492-5540
lstorylaw@gmail.com

42