UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CRAIG LEE MILLER,

       Plaintiff,

  v.                                 Case No. 18-cv-1126-pp

CAROL STRAKS,

       Defendant.

## ORDER AWARDING PLAINTIFF TOTAL DAMAGES IN THE AMOUNT OF $1.5 MILLION AND DISMISSING CASE

On July 25, 2025, the court granted plaintiff Craig Lee Miller's motion for a hearing to determine the amount of damages to which he is entitled under the default judgment (Dkt. No. 85) the court entered against defendant Carol Straks on his Eighth Amendment claim. Dkt. No. 100. The court scheduled a telephonic damages hearing on October 1, 2025 to give the plaintiff an opportunity to testify and to present evidence in support of his request for damages. Id. at 23.

On October 1, 2025, the court held the damages hearing. Dkt. No. 103. Defendant Straks did not appear for the hearing. The court asked the plaintiff questions about his interactions with Straks and allowed him to provide testimony in support of his request for damages. This order summarizes his testimony, analyzes the plaintiff's request for damages based on the relevant law and awards the plaintiff the amount of damages that the court has determined is appropriate given the facts of this case and damages awards in similar cases.

## I.    Relevant Background

The court will provide only a limited background of the case and the plaintiff's claim because it provided a detailed background in its last two orders. See Dkt. Nos. 85 at 1–11, 100 at 1–4.

The plaintiff is proceeding on allegations that from July 2011 through July 2012, defendant Straks sexually assaulted him nearly every day while he was incarcerated at Oshkosh Correctional Institution, where Straks worked as a nurse. Dkt. No. 50 at 8 (citing Dkt. No. 40 at ¶¶50, 83). He alleged that Straks used "'grooming behavior' to earn his trust, including complimenting him, flirting with him and providing him 'special benefits.'" Id. (citing Dkt. No. 40 at ¶56). The plaintiff alleged that Straks targeted him "because of his drug dependency" and smuggled Vicodin or OxyContin to give to the plaintiff in exchange for sexual contact during treatment sessions. Id. at 9–10 (citing Dkt. No. 40 at ¶¶50, 53–54, 85–86). The plaintiff alleged that he eventually began to feel "'trapped'" and forced to continue satisfying Straks or risk having time added to his prison sentence. Id. at 10 (citing Dkt. No. 40 at ¶¶58–59). The plaintiff sought compensatory damages of at least $1 million and punitive damages of at least $100,000. Id. at 5–6 (citing Dkt. No. 40 at pp. 41–42).[1]

---

[1] The plaintiff recently filed a letter with the court in which he updated his damages request to $50 million in compensatory damages, $100 million in punitive damages and $5 million for "[f]uture treatment for mental health and addiction." Dkt. No. 90.

2

## II.    Plaintiff's Testimony[2]

At the October 1, 2025 telephonic hearing, the court asked the plaintiff questions about his interactions with Straks, and the plaintiff provided detailed testimony in support of his claim. The plaintiff testified, as he alleged in his complaint, that he met Straks in July 2011. He testified that he initially had a legitimate reason to see Straks, who was a nurse and provided treatment for the plaintiff's chronic back pain. Straks would apply pain cream to the plaintiff's back, treatment that he received from her every day for an "extended period." These sessions occurred in a treatment room in the Health Services Unit at Oshkosh, where he and Straks had a "degree of privacy" for ten to fifteen minutes at a time.

The plaintiff testified that by the second or third session, he noticed that Straks "was being stimulated in a sexual way" during the treatment. When the plaintiff asked her if she was "deriving some satisfaction" from the sessions, Straks "said yes and smiled." The plaintiff testified that he did not tell Straks to stop or that it was making him uncomfortable. He admitted that at first, he enjoyed it. The plaintiff testified that the sessions with Straks then became about sex. The plaintiff would see Straks walk by his window and would become excited for their next session. He said that he felt that he and Straks were "falling in love."

---

[2] The court has used quotation marks when directly quoting the plaintiff's testimony from the evidentiary hearing. The full audio of the hearing is available at Dkt. No. 103.

But the plaintiff testified that after a short time, he began to feel like he could not refuse to participate in the sexual encounters, even if he wanted to refuse. The plaintiff stated that he still needed treatment for his back pain, but that Straks had started "doing things to [his] body" and to him that he felt were humiliating. He testified that he began to feel a mix of love and affection but also fear of losing what he had with her. He testified that as early as the fourth session, despite Straks being aware that he had had addiction issues in the past, she began providing him non-prescribed pills for his ongoing pain. The plaintiff recalled these pills being Vicodin and said that Straks would provide them to him "whenever she had them" or whenever she could safely get them from the institution. The plaintiff agreed with the court's suggestion that the relationship was "mutually beneficial" and that both he and Straks received pleasure from their sessions—Straks would receive physical pleasure from the sexual contact, and the plaintiff received pain pills to feed his addiction.

The plaintiff testified that after about two months of the daily encounters, things began to change. He stated that it was "fun" for about two months, but then Straks became "more aggressive," demanded more and became "more controlling." He testified that one day Straks told him that "they" asked her questions about her sessions with the plaintiff, and she told the plaintiff that she could "bring him in" because "they're already on to you." Straks suggested that she could have told authorities about her and the plaintiff, but didn't. The plaintiff stated that he began to worry that he could "be in the rest of his life" if he upset Straks, that she could tell officials that he

was taking advantage of her. But Straks assured him that she was "saving [him]" from being questioned and told him, "Don't worry about it." The plaintiff agreed with the court that this was "how fear was initiated" and how Straks became more controlling. He felt that if he were ever questioned about their relationship, officials would believe her over him because of his record and incarcerated status.

The plaintiff testified that Straks "made it clear on more than one occasion" that she was in control. He stated that he continued to engage in sexual contact with her even if he did not want to because of the risk, the access she had given him to drugs and the attention and affection that was hard to come by in prison. He testified that about 70 to 75% of the time over the next ten months, he "felt obligated" to participate in sexual contact, to "do whatever [he] needed to do" to satisfy Straks. He stated that he no longer had sexual desire or love toward her; he just knew that he needed to "fulfill [his] end of the bargain" to avoid harm or trouble. The court asked the plaintiff if Straks ever denied his request for drugs unless the plaintiff agreed to have sex or sexual contact with her. He stated that Straks would not explicitly threaten to deny him drugs, but that she would "position" herself near him and perform suggestive acts to remind him of what he needed to do before he would get drugs. He stated that Straks would tease him with the offer of drugs so that they "would both leave happy."

The plaintiff testified that during these ten months, he felt afraid because he knew it would take only "one mistake" for Straks to end things or to tell

officials about their relationship. He said that he felt a combination of anticipation of drugs and fear of what she might do—how easily she could do something, and his life would be over. When the court asked for clarification, the plaintiff stated that he was afraid that he "would never walk out of there," would never get out of prison if officials found out. He testified that "this thing with Carol" never stopped even after he was out of prison and that he "never recovered" from the emotional stress he felt. He testified that he felt humiliated and like he had let his wife down. He called Straks "a manipulator" because he learned that she was involved with another incarcerated person who she claimed was her fiancée. He testified that Straks "never gave a damn" about him and used him.

The court asked the plaintiff if he was using drugs at Oshkosh before he met Straks. He denied using any illicit substances while incarcerated since 2004 (although he had done so before entering Oshkosh). He stated that when Straks first provided him Vicodin in July 2011, it was his first time using in over six and a half years. He said that his sessions with her triggered his substance abuse, which followed him after his transfer out of Oshkosh and his eventual release from incarceration.

The court asked the plaintiff when his wife first learned that he had been involved with Straks during his incarceration at Oshkosh. The plaintiff testified that in late 2016 or early 2017, investigators met with him to discuss his interactions with Straks. The plaintiff said that he told his wife that the investigators were investigating a staff member at Oshkosh, but that he did not

divulge the extent of his relationship with that person. The plaintiff revealed that he was still seeing Straks even after he left Oshkosh, and testified that he wrote to her while he was at other institutions and even after he was released from incarceration. He testified that sometime after his release, he told his wife about his sexual relationship with Straks. He stated that in retaliation, his wife then filed a false report with the police, which eventually resulted in his parole being revoked. The plaintiff testified that his wife attempted to retract her report, but that he still was prosecuted and reincarcerated. The plaintiff stated that the deterioration of his marriage "had everything to do with th[e] relationship" with Straks, and he blamed that relationship for destroying his marriage and causing his reincarceration. The plaintiff expressed dismay that he was not with his wife more as she was seeking treatment for her illness. He revealed that there was at least one time when his wife was attending a doctor's appointment, and he was not with her because he was with Straks.

The plaintiff expressed anger at Straks for not apologizing to him for the pain she has caused him since July 2011. Yet he also revealed that he last saw Straks five or six months ago, before his most recent parole revocation. He was not sure when he had last spoken with her outside of this case. When the court asked why the plaintiff would continue to see Straks after everything that had happened between them, he explained that he had no one left after his wife's passing. He said that he was trying to get his life back on track, but that he struggles with his addiction and negative emotions from his interactions with Straks.

### III.   Calculation of Damages

As the court has said in prior orders, it is unclear whether the plaintiff will be able to recover any damages from Straks. She has maintained that she has no money, and neither the Department of Corrections nor the State of Wisconsin is a party to this case. Straks was not a DOC or State employee and may not seek an indemnification from either. Nor is either of those entities liable to the plaintiff for damages based on Straks's conduct. Nonetheless, the court held the evidentiary hearing as part of its obligation to "conduct an inquiry" into the evidence supporting an award of damages and to "ascertain the amount of damages with reasonable certainty." In re Catt, 368 F.3d 789, 793 (7th Cir. 2004) (quotation omitted); see Fed. R. Civ. Pro. 55(b)(2).

### A.   Compensatory Damages

The court explained in its previous order that under 42 U.S.C. §1983, compensatory damages are intended to compensate the plaintiff for the tangible loss and the personal loss (humiliation, mental anguish and suffering) caused by the defendant's deprivation of his constitutional rights. Dkt. No. 100 at 11–12 (citing Memphis Cmty. School Dist. v. Stachura, 477 U.S. 299, 306–07 (1986); Cary v. Piphus, 435 U.S. 247, 255 (1978)). "These damages may include compensation for intangible emotional harm and even nominal damages where no actual injury occurs." Manley v. Law, 889 F.3d 885, 890 (7th Cir. 2018) (citing Carey, 435 U.S. at 266). The plaintiff bears the burden of proving that he suffered actual damages. Hagge v. Bauer, 827 F.2d 101, 109 (7th Cir. 1987).

8

The plaintiff did not provide any evidence or testimony showing that he spent money seeking treatment for the harm caused by Straks's actions. Nor did he testify that he spent money on counseling, addiction relief or any other tangible loss. But he did testify at length about the psychological impact of his sexual relationship with Straks. He stated that he began to feel afraid and trapped after about two months of their daily sessions, when he started to worry that Straks might say something to prison officials that could keep him incarcerated for the rest of his life. He also testified about the physical impact that Straks had on him—triggering his substance abuse disorder almost immediately after they began treatment sessions. The plaintiff stated that he had been clean since his arrival at Oshkosh in 2004, but that his addiction restarted once Straks offered him drugs, and it continues to plague him to this day.

To aid its determination of a proper damages amount, the court has attempted to find similar cases where incarcerated persons were awarded damages against prison officials with whom they had a non-consensual sexual relationship or encounter. One such case is Jessie v. Wouts, Case No. 17-cv-840 (W.D. Wis. Jan. 31, 2019), which the court discussed at length in its previous order. Dkt. No. 100 at 15–16 (citing Dkt. No. 73). The plaintiff in Jessie was a former incarcerated person who alleged that a correctional officer had sexually assaulted and raped him fifty to fifty-five times while he was incarcerated. Dkt. No. 73 at 1. The plaintiff in Jessie, like the plaintiff here, did not testify about any physical injuries or provide evidence of mental health or substance abuse treatment he sought. Id. at 4. But he provided detailed

testimony about the defendant's assaults, which the court determined entitled the plaintiff to compensatory damages for "the mental and emotional pain and suffering, including the loss of normal life activities, that he has experienced and is reasonably certain to experience in the future." Id. The court awarded the plaintiff $1.5 million in compensatory damages. Id.

The court has found additional comparison cases to aid its calculations. The first is Williams v. Billington, Case No. 22-CV-1300, 2025 WL 1807755 (S.D. Ill. July 1, 2025), in which a male incarcerated person claimed that a female official working in the dietary unit at Lawrence Correctional Center in Sumner, Illinois had forced him to engage in sexual encounters with her from March 2020 through August 2021. As in this case, the Billington court entered default judgment against the defendant and held an evidentiary hearing to determine damages. Id. at *1. The plaintiff testified that the defendant first wrote him notes expressing her interest and then escalated to forcing herself on him and threatening to claim that he had raped her if he did have oral and penetrative intercourse with her. Id. at *1–*2. The plaintiff stated that the encounters ended when he was placed on investigative status and submitted a report under the Prison Rape Elimination Act, which the Illinois Department of Corrections found to be substantiated. Id. at *2.

The plaintiff testified about the mental distress, fear and suicidality that he suffered from the defendant's actions. Id. at *4–*5. He stated that he required mental health treatment including psychotropic medications, which he never had needed before. Id. at *5. The court also heard testimony from the

plaintiff's mother, who testified that the plaintiff had become quiet, withdrawn and ashamed about his actions. Id. at *6. The court compared the plaintiff's testimony with the facts of several other cases, a few of which this court will discuss below. Id. at *7–*8. Ultimately, the court determined that the plaintiff was entitled to compensatory damages based on his testimony that he "was sexually assaulted on numerous occasions and kissed/groped on an almost daily basis for 18 months." Id. at *8. The court accepted the plaintiff's request and awarded him $500,000 in compensatory damages. Id.

The court in Billington cited a case from this district, Kelty v. Patterson, Case No. 18-CV-762, 2019 WL 2417644 (E.D. Wis. June 10, 2019). The plaintiff in Kelty was a twenty-two-year-old woman incarcerated at Taycheedah Correctional Institution; she alleged that a fifty-one-year-old male correctional officer sexually assaulted her three times. Kelty, 2019 WL 2417644, at *1–*2. The court entered default judgment against the defendant when he failed to answer the complaint or appear, then held an evidentiary hearing to determine damages. Id. at *1. The plaintiff alleged that her relationship with the defendant was friendly at first but became sexual during a hot summer, when the defendant began to shine his flashlight at her after dark to signal her "to flash her private parts at" him. Id. She testified that the defendant then sexually assaulted her in supply rooms away from other people, during which he groped and kissed her and performed nonconsensual oral sex. Id. at *3. The plaintiff testified that she was not attracted to men, which the defendant knew; she testified that the assaults caused her fear, shock, disgust and feelings of

worthlessness and helplessness. Id. at *2–*3. She stated that she had suffered nightmares, flashbacks and thoughts of self-harm since the assaults, and she had been diagnosed with post-traumatic stress disorder. Id. A magistrate judge recommended that the plaintiff be awarded $900,000 in compensatory damages, and the district court accepted that recommendation. Id. at *7, report and recommendation adopted, 2019 WL 3501526 (E.D. Wis. July 31, 2019).

Another case discussed by the Billington court is Quickle v. Baldwin, Case No. 18-CV-1332 (C.D. Ill. Sept. 20, 2020). A male incarcerated person alleged that a female food supervisor forced him into a sexual relationship. Id., Dkt. No. 107 at 1. The court entered default judgment against the defendant and recruited her counsel for a bench trial on damages. Id. at 2. The plaintiff testified that over six months, the defendant repeatedly demanded that the plaintiff have sexual intercourse with her and threated to accuse him of rape if he refused. Id. He testified that because of the defendant's actions, he suffered from panic attacks, anxiety, depression and difficulty sleeping and had engaged in self-harm. Id. at 4. The plaintiff sought $500,000 in compensatory damages and cited J.K.J. v. Polk County (discussed below) and Kelty. Id. at 3–4. The court determined that some of the alleged harm was "attributable to different actors" and awarded the plaintiff $100,000 in compensatory damages. Id. at 5.

Counsel for the plaintiff in Jessie also submitted several exemplar cases to the court to assist its decision on damages. Jessie, Case No. 17-cv-840 (W.D. Wis.), Dkt. Nos. 24, 24-1. This court also will consider these cases, but it notes

that they involve a jury award after trial rather than a court's determination after an entry of default judgment and an evidentiary hearing.

Counsel first cited <u>J.K.J. v. Polk County, *et al.*</u>, Case No. 15-cv-428 (W.D. Wis.) (consolidated with <u>M.J.J. v. Polk County, *et al.*</u>, Case No. 15-cv-433 (W.D. Wis.)), in which a Polk County jailer sexually assaulted two different women while they were incarcerated. After a trial, the jury found in favor of the two plaintiffs and awarded each $2 million in compensatory damages. <u>J.K.J. v. Polk County</u>, 960 F.3d 367, 375–76 (7th Cir. 2020) (*en banc*) (affirming judgment and damages award against the jailer).

In this district, Judge Stadtmueller presided over a trial where the evidence showed that a correctional officer at the Milwaukee County Jail had raped the plaintiff (a young woman under the age of twenty) five times, and she was forced to give birth to her child while restrained to a hospital bed. <u>Doe v. County of Milwaukee</u>, Case No. 14-C-200, 2014 WL 3728078, at *1 (E.D. Wis. July 29, 2014). The jury awarded the plaintiff $1.7 million in compensatory damages. <u>Martin v. County of Milwaukee</u>, Case No. 14-CV-200, 2017 WL 4326512, at *3 (E.D. Wis. Sept. 28, 2017), <u>rev'd and vacated in part on other grounds</u>, 904 F.3d 544 (7th Cir. 2018).

Counsel in <u>Jessie</u> also cited <u>Lee *ex rel.* Lee v. Borders</u>, Case No. 09CV1977, 2013 WL 4517730 (E.D. Mo. Aug. 26, 2013), <u>aff'd</u>, 764 F.3d 966 (8th Cir. 2014). In <u>Lee</u>, a jury awarded $1 million in compensatory damages to a woman who was raped by a kitchen worker in a mental health treatment center. <u>Id.</u> at *1, *4. The court denied the defendant's motion for judgment

notwithstanding the verdict or for a new trial, finding the damages award appropriate based on "the circumstances of the sexual assault on Plaintiff taking place in residential facility run by the department of mental health, the vulnerability of Plaintiff as a target, [and] the residual psychological symptoms it has engendered." Id. at *7.

This court explained in its July 25, 2025 order that the plaintiff could recover compensatory damages for "the mental and emotional injuries he has suffered because of Straks's sexual contact with him between July 2011 and July 2012 while the plaintiff was confined at Oshkosh" and also for "any mental or emotional injuries . . . [that] continued after July 2012." Dkt. No. 100 at 17; see 42 U.S.C. §1997e(e). The court clarified that the plaintiff could not recover damages "for other incidents that may have occurred at other times, in other places, with other individuals." Dkt. No. 100 at 17.

The court has considered the plaintiff's testimony and other evidence presented in support of his request for compensatory damages. The plaintiff testified that he had daily sexual encounters with Straks for approximately one year but admitted that the sexual relationship was consensual for the first two months. He testified that Straks's actions caused him significant fear, humiliation, anxiety and distress while he was at Oshkosh and in the years since his transfer out of Oshkosh and release back into the community. He testified that his contact with Straks triggered his substance use disorder, which has continued to trouble him even when he has not been incarcerated. He stated that the residual feelings from this relationship played a significant

part in the deterioration of his marriage, his substance use since his release and his reincarceration when his parole was revoked. The plaintiff testified that he felt guilt over his infidelity and his frayed relationship with his wife, but he also admits that he was complicit in the relationship with Straks at the beginning, even after she became controlling and introduced drugs. The plaintiff testified that he was not with his wife during some of her physical suffering because he was with Straks. But he was out of custody at that point and he did not testify that Straks was somehow forcing him to be with her. He also testified that he has continued to see, speak with and write to Straks since he left Oshkosh in July 2012. The plaintiff expressed anger at Straks for her apparent lack of remorse.

The court finds that the plaintiff has presented sufficient evidence of mental and emotional injuries beginning from Straks's actions in 2011 and continuing to this day. He has presented evidence of physical injury in the form of his substance use disorder, which he testified was restarted by Straks's actions after the plaintiff had experienced several years of sobriety. The court finds that, based on his testimony, the plaintiff is likely to continue to suffer emotional distress and substance abuse for at least the near future. But the plaintiff's feelings of guilt over his infidelity are not compensable. That the plaintiff regrets *his* actions does not factor into Straks's liability for *her* actions and the psychological or physical pain that she caused him.

In consideration of these factors and of damages awards in similar cases, the court finds that an award of compensatory damages in the amount of $500,000 is reasonable and appropriate.

B.    Punitive Damages

The court explained in the previous order that the plaintiff also may recover punitive damages if he showed "that Straks's conduct was 'motivated by evil motive or intent' or that she 'had a reckless or callous disregard to the federally protected rights of others.'" Dkt. No. 100 at 18 (citing Smith v. Wade, 461 U.S. 30, 56 (1983); Woodward v. Corr. Med. Servs. of Ill., Inc., 368 F.3d 917, 930 (7th Cir. 2004)). The court explained "that the standard for punitive damages 'is the same standard as for § 1983 liability,'" so the plaintiff may be entitled to punitive damages merely by showing that Straks "'acted with deliberate indifference or reckless disregard.'" Id. (quoting Woodward, 368 F.3d at 930 (internal quotation omitted)).

The court also cited the Seventh Circuit's Pattern Jury Instructions. Id. at 20. Those instructions provide that the court "may consider several factors in assessing punitive damages, including 'the reprehensibility of Defendant's conduct,' 'the impact of Defendant's conduct on Plaintiff' and 'the relationship between Plaintiff and Defendant.'" Id. (quoting Seventh Cir. Pattern Civil Jury Instruction §7.28 and citing Hardy v. City of Milwaukee, 88 F. Supp. 3d 852, 865 (E.D. Wis. 2015)). The court also quoted the Supreme Court's decision in BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996), where it stated, "'[p]erhaps the most important indicium of the reasonableness of a punitive

damages award is the degree of reprehensibility of the defendant's conduct.'" Id. The court also may consider the relationship between the "harm suffered and the punitive award" and "the penalties imposed in comparable cases." Rainey v. Taylor, 941 F.3d 243, 254 (7th Cir. 2019) (citing BMW, 517 U.S. at 575).

The court will first discuss the similar cases cited above to assist its determination of a proper award of punitive damages. In the Jessie case from the Western District of Wisconsin, the court awarded the plaintiff $3 million in punitive damages for the fifty-plus instances of sexual assault committed by a correctional officer. Dkt. No. 73 at 5. In Billington, whose facts are very similar to those in this case, the court awarded the plaintiff $1 million (as he had requested) based largely on "the reprehensibility of the defendant's conduct," which involved using "every tool at her disposal to fulfill her own evil and selfish motives with no concern for Plaintiff's rights or wellbeing—from making threats based upon power dynamics, race, and gender, to providing frightening details of Plaintiff's family." Billington, 2025 WL 1807755, at *9. The Kelty court awarded the plaintiff $1.5 million in punitive damages against a correctional officer whose "job was to keep inmates safe; [but] he did the opposite" and instead "abused his position of power and [the plaintiff's] trust" and "prey[ed] upon a victim who was not only incarcerated but also young and inexperienced in the prison system." Kelty, 2019 WL 2417644, at *8. The Quickle court awarded the plaintiff $200,000 in punitive damages, which it concluded was "warranted by [the defendant's] reprehensible conduct and the

17

need to deter her and others from similar conduct in the future." Quickle, Case No. 18-CV-1332, Dkt. No. 107 at 5.

The court also will consider the cases that the plaintiff's counsel in Jessie cited, though those cases involve a jury award after trial rather than a court's determination after an evidentiary hearing. In J.K.J., 960 F.3d at 375, the jury awarded each plaintiff $3.75 million in punitive damages. In Martin, 2017 WL 4326512, at *3, a jury awarded the plaintiff $5 million in punitive damages. In Lee ex rel. Lee, 2013 WL 4517730, at *1, the jury awarded the plaintiff $3 million in punitive damages. Counsel also cited Spurlock v. Townes, Case No. 09CV786, 2012 WL 12897891, at *1 (D.N.M. Sept. 6, 2012), aff'd in part, vacated in part, 661 F. App'x 536 (10th Cir. 2016), in which a jury awarded two women $1 million each in punitive damages against a corrections officer who sexually assaulted them at a privately owned correctional center.

The court previously determined that that plaintiff's allegations showed that Straks "'could not help but know that sexually assaulting an inmate (repeatedly) and feeding an inmate illegal drugs was inhumane.'" Dkt. No. 100 at 19 (quoting Dkt. No. 12 at 6). The plaintiff's testimony at the evidentiary hearing bolsters this finding. The plaintiff testified that Straks used her position as a nurse to take advantage of him. He testified that their relationship began with a legitimate purpose—medical treatment for the plaintiff's back pain. But within a few sessions, Straks began to take physical pleasure from the sessions. The plaintiff testified that Straks knew he had substance use issues and used that knowledge to force his continued engagement in a sexual

18

relationship, providing him pain pills. Once the plaintiff began to express discomfort with the sexual relationship, Straks turned to threats and used his fear of continued incarceration to coerce him into continuing to provide her pleasure.

The court finds punitive damages appropriate based on Straks's reprehensible behavior, the relationship between Straks (a nurse) and the plaintiff (an incarcerated person with substance use issues) and the effect of her conduct on the plaintiff as described in the amended complaint and in his testimony. Although Straks's actions might not best be described as "motivated by evil motive or intent," the evidence allows the conclusion that she recklessly and callously disregarded the plaintiff's rights and used his weaknesses against him to get what she wanted. She not only knew that he was incarcerated, but she had access to his medical records and knew he was susceptible to coercion through the use of drugs. She also used the plaintiff's fear of further incarceration to keep him compliant with her sexual demands. The plaintiff testified that Straks has never apologized for her actions or shown remorse for the effects of her actions on his life or for the physical and psychological harm she caused him. The plaintiff also testified that he willingly has maintained contact with Straks since leaving Oshkosh. But his decision to maintain this relationship in the last thirteen years does not alter the court's conclusion that significant punitive damages are warranted given Straks's abuse of her medical position and her use of a patient's substance use disorder against him for her own gain.

The court will award the plaintiff punitive damages in the amount of $1 million.

## IV.    Conclusion

The court **FINDS** that the plaintiff is entitled to compensatory and punitive damages against defendant Carol Straks.

The court **AWARDS** the plaintiff compensatory damages in the amount of $500,000.

The court **AWARDS** the plaintiff punitive damages in the amount of $1 million.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **thirty days** of the entry of judgment. See Fed. R. App. Pro. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. Pro. 4(a)(5)(A). If the plaintiff appeals, he will be responsible for prepaying the $605 appellate filing fee because he has accumulated three strikes under 28 U.S.C. §1915(g).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **twenty-eight days** of the entry of judgment.

The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 7th day of October, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**